USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/31/2020____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CASSIDY M. TERESI,                                  :
                                                    :
                 Plaintiff,                         :
                                                    :
         -against-                                  :
                                                    :         19-CV-1268 (JLC)
COMMISSIONER OF SOCIAL SECURITY,   :
                                                    :
                 Defendant.                         :
                                                    :
-----------------------------------------------------------------X


**<u>OPINION AND ORDER</u>**

TABLE OF CONTENTS

I.    BACKGROUND.................................................................................. 1

   A.   Procedural Background ........................................................... 1

   B.   The Administrative Record....................................................... 3

      1.   Teresi's Background ............................................................ 3

      2.   Relevant Medical Evidence ................................................ 4

         a.   Treatment History ......................................................... 4

            i.   Adrienne Salomon, M.D.—Treating Neurologist.............. 4

            ii.   Ruben Kuzniecky, M.D.—Psychiatrist........................... 6

         b.   Opinion Evidence ......................................................... 7

            i.   Adrienne Salomon, M.D.—Treating Neurologist.............. 7

            ii.   Ruben Kuzniecky, M.D.— Psychiatrist........................... 7

            iii.   William Barr, M.D.—Consultative Expert....................... 8

            iv.   Arlene Broska, M.D.—Consultative Examiner................. 9

            v.   L. Hoffman—State Agency Medical Consultant ............. 10

            vi.   Rita Figueroa, M.D.—Consultative Examiner................. 12

      3.   ALJ Hearing ...................................................................... 13

II.   DISCUSSION ................................................................................... 16

   A.   Legal Standards ..................................................................... 16

      1.   Judicial Review of Commissioner's Determinations.................. 16

      2.   Commissioner's Determination of Disability ........................... 17

         a.   Five-Step Inquiry ......................................................... 18

         b.   Duty to Develop the Record........................................... 19

         c.   Treating Physician's Rule............................................... 21

         d.   Claimant's Credibility.................................................... 24

   B.   The ALJ's Decision................................................................ 26

   C.   Analysis ................................................................................. 31

      1.   Lay Witness Testimony ...................................................... 32

         a.   The ALJ Properly Evaluated Theresa's Testimony and Credibility........ 33

         b.   The ALJ Properly Evaluated Teresi's Credibility ................... 37

2.    The ALJ Properly Evaluated the Opinion Evidence...................................... 40

    a.    Dr. Rita Figueroa ................................................................ 40

    b.    Dr. Arlene Broska ............................................................... 45

    c.    Dr. L. Hoffman .................................................................... 48

3.    The ALJ Did Not Violate Her Duty to Develop the Record ......................... 49

    a.    Dr. Salomon........................................................................ 49

    b.    Dr. Kuzniecky .................................................................... 52

4.    The Court Has No Jurisdiction Over the Prior ALJ Decision .................... 54

III.   CONCLUSION ................................................................................ 56

**JAMES L. COTT, United States Magistrate Judge.**

Plaintiff Cassidy M. Teresi seeks judicial review of a final determination by defendant Andrew M. Saul, the Commissioner of the Social Security Administration, denying Teresi's application for childhood disability insurance benefits and supplemental security income under the Social Security Act.  The parties have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set forth below, Teresi's motion is denied and the Commissioner's cross-motion is granted.

## I.  BACKGROUND

### A.  Procedural Background

Teresi initially filed for Social Security Childhood Disability Benefits ("CDB") and Supplemental Security Income ("SSI") on September 24, 2012.  *See* Administrative Record ("AR"), Dkt. No. 16, at 109.[1]  She alleged that she has had epilepsy and a seizure disorder since she was born, August 11, 1994.  *Id.* at 109, 245, 247, 280–81.[2]  The claims were denied on January 15, 2013.  *Id.* Administrative Law Judge ("ALJ") Dennis G. Katz held a hearing on March 12,

---

[1] The page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing System.

[2] "Epilepsy is a brain disorder that causes people to have recurring seizures. The seizures happen when clusters of nerve cells, or neurons, in the brain send out the wrong signals. People may have strange sensations and emotions or behave strangely. They may have violent muscle spasms or lose consciousness. . . . There is no cure for epilepsy, but medicines can control seizures for most people."  *See Epilepsy*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/epilepsy.html (last visited Aug 28, 2020).

2014 and issued an unfavorable decision on May 20, 2014. *Id.* at 106–25. A Notice of Decision with a copy of the decision was sent to Teresi on May 20, 2014. *Id.*

Thereafter, on May 8, 2015, Teresi filed a second application for CDB and SSI, alleging an onset date of May 8, 2015. *Id.* at 215–27.[3] The Social Security Administration ("SSA") denied Teresi's claim on August 10, 2015. *Id.* at 126–39. On October 6, 2015, Teresi requested a hearing before an ALJ and, on June 9, 2017, Teresi appeared before ALJ Katherine Edgell via videoconference. *Id.* at 18, 36, 140–44, 212. Teresi did not have an attorney present and, after being informed of her right to have an attorney, decided to proceed with the hearing unrepresented. *Id.* at 36–44. Theresa Teresi (Teresi's mother) and Andrew Pasternak, a vocational expert, also testified at the hearing. *Id.* at 34. ALJ Edgell subsequently issued a decision dated March 15, 2018, in which she found that Teresi was not disabled. *Id.* at 18–28. On May 2, 2018, Teresi sought review of the ALJ's decision through the Appeals Council. *Id.* at 213–14. Her request was denied on December 13, 2018, rendering the ALJ's decision final. *Id.* at 2–7.

Teresi timely commenced the present action on February 10, 2019, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). Complaint, Dkt. No. 1. The Commissioner answered Teresi's complaint by filing the administrative record on June 24, 2019. AR, Dkt. No. 16. On August 22, 2019,

---

[3] Although Teresi stated in her applications for CDB and SSI that her disability began on May 8, 2015, ALJ Katherine Edgell set the onset date to May 21, 2014, the day after ALJ Katz issued an unfavorable decision to Teresi's first application. *Id.* at 18, 45.

2

Teresi moved for judgment on the pleadings seeking remand for further administrative proceedings and submitted a memorandum of law in support of her motion ("Pl. Mem."). Dkt. Nos. 17–18. The Commissioner cross-moved for judgment on the pleadings on November 20, 2019 and submitted a memorandum in support of his cross-motion ("Def. Mem."). Dkt. No. 21. Teresi filed her reply papers on November 27, 2019 ("Pl. Reply"). Dkt. No. 22.

**B. The Administrative Record**

    **1. Teresi's Background**

Teresi was born on August 11, 1994. AR at 46. She was 19 years old on her alleged onset date of disability (May 21, 2014). *Id.* at 18, 215, 224. At the time of her hearing before ALJ Edgell, Teresi lived with her mother, Theresa Teresi ("Theresa"), in Otisville, New York. *Id.* at 45. She completed high school and took some classes in college before dropping out. *Id.* at 48. Since her alleged date of disability, Teresi worked as a sales associate at a retail store for three days, as a hostess at Ruby Tuesday's short-term but "more than a month," and occasionally as an attendant at a concession stand at Justice For All Productions. *Id.* at 48–50. She has not worked since March 2015. *Id.* at 245.

During the hearing, Teresi described the extent of her seizure disorder and the scope of her ability to function, perform daily tasks, and travel outside of her home. *Id.* at 47–56. Teresi reported being able to clean, do laundry, make her bed, and vacuum. *Id.* at 54. She also testified that she socializes with friends, goes bowling, watches movies, and enjoys social media. *Id.* at 55. In her function report,

3

dated May 18, 2015, Teresi alleged that she cannot be alone, take baths, or use sharp knives or hot tools because she may have a seizure. *Id.* at 262–64. Teresi testified that she cannot work full-time because of her difficulty with math and performing simple tasks. *Id.* at 50. She also alleges she cannot work because of her seizure disorder, a brain tumor, and galactosemia. *Id.* at 245.[4]

### 2. Relevant Medical Evidence

#### a. Treatment History

##### i. Adrienne Salomon, M.D.—Treating Neurologist

Adrienne Salomon, M.D., is Teresi's treating neurologist for her seizure disorders, which are caused by her epilepsy. *Id.* at 50, 362-63, 531. Dr. Salomon treated Teresi beginning in December 2014 through at least April 19, 2017. On December 24, 2014, during an office visit with Dr. Salomon, Theresa reported that Teresi had four episodes of seizure over the previous two months but Teresi stated she did not remember these events. *Id.* at 370. Dr. Salomon performed a neurological examination and noted that the patient was "awake and alert," "[held] the attention to examiner throughout [the] entirety of [the] examination" and "[f]ollow[ed] multi-step instructions." *Id.* at 372. Dr. Salomon then sent Teresi for an MRI of her brain and an electroencephalography ("EEG") test. *Id.* at 373. The EEG results showed right-sided sharp waves that are "indicative of a seizure

---

[4] "Galactosemia is a condition in which the body is unable to use (metabolize) the simple sugar galactose. . . . People with galactosemia cannot tolerate any form of milk (human or animal). They must be careful about eating other foods containing galactose." *See Galactosemia*, U.S. NATIONAL LIBRARY OF MEDICINE: MEDLINE PLUS, https://medlineplus.gov/ency/article/000366.htm (last visited Aug. 28, 2020)

tendency" and that Teresi "may have had an electrographic seizure." *Id.* at 650. In a subsequent visit on January 7, 2015, Teresi's mother reported that Teresi was having two to three episodes of staring per week since her last visit. *Id.* at 367. As a result, Dr. Salomon scheduled additional testing for Teresi. *Id.* at 369. On February 4, 2015, Teresi's mother told Dr. Salomon that Teresi had not experienced any seizure episodes since being on her medication for one week. *Id.* at 362. Dr. Salomon advised Teresi that she should not drive given her seizures. *Id.* at 363. Dr. Salomon referred Teresi to Ruben Kuzniecky, a board-certified clinical neuropsychologist, and noted a follow up appointment with Teresi. *Id.* at 363, 382. At her follow up visit on November 16, 2015, Teresi reported being seizure free since she underwent surgery to remove a frontal tumor on her brain in September 2015. *Id.* at 620, 631.[5] Dr. Salomon sent Teresi for an EEG for further evaluation. *Id.* at 622. On December 9, 2015, Teresi's mother called and reported that Teresi had had two seizures, which were due to noncompliance in taking her medicine. *Id.* at 676. Dr. Salomon's notes from a December 29, 2015 appointment state that Teresi had been seizure free since her last reported seizure in early December. *Id.*

On February 10, 2016, Dr. Salomon observed that the most recent EEG did not show any "push button events" nor any detection of seizures. *Id.* at 609 ("The portions of the study demarcated by spike and seizure detection algorithms were reviewed and they did not reveal any abnormalities . . . ."). On March 29, 2016, Dr.

---

[5] Although not readily apparent on its face, the November 16, 2015 report appears to summarize Teresi's December 24, 2014 visit and prior EEG and MRI results before providing notes for Teresi's November 16, 2015 visit. *Id.* at 620.

Salomon reported that Teresi had been compliant with her medication and was seizure free since her last visit.  *Id.* at 601.  Dr. Salomon advised Teresi to continue complying with her medication and to follow up in three months.  *Id.* at 603.

On August 5, 2016, Teresi visited Crystal Run Healthcare, but saw Dr. Maria T. Ranin-Lay instead of Dr. Salomon.  *Id.* at 590.  Dr. Ranin-Lay reported that Teresi had experienced "no seizure since [she was] last seen," was "compliant with medication Keppra," and "want[ed] to start tapering, [and] will follow up with Dr. Salomon."  *Id.* at 590.  Teresi denied "anxiety and depression" at that time.  *Id.*

Teresi saw Dr. Salomon again on December 5, 2016, at which time Dr. Salomon recorded that "[s]ince our last visit she has been seizure free."  *Id.* at 584. Dr. Salomon noted that Teresi was "awake and alert" and that she "holds attention to examiner throughout entirety of examination."  *Id.* at 585.  With respect to Teresi's seizure disorder, Dr. Salomon reported that she is "[s]table" and should continue on Keppra and follow up in six months.  *Id.* at 585.  At her next visit with Dr. Salomon on April 19, 2017, Teresi stated that she had been compliant with her medication and "denied any seizure episodes."  *Id.* at 568.  Dr. Salomon found that she was stable on Keppra and "seizure free over a year."  *Id.* at 570.  Dr. Salomon recommended a follow up visit in one year.  *Id.*

### ii.    Ruben Kuzniecky, M.D.—Psychiatrist

Teresi was referred to Ruben Kuzniecky, M.D., by Dr. Salomon for further evaluation and treatment concerning her seizures.  *Id.* at 382.  On March 31, 2015, Teresi had an initial visit with Dr. Kuzniecky and reported an onset of seizures

starting in October 2014 with subsequent "recurrent focal seizures" that occurred almost daily and sometimes twice per day, at their highest frequency. *Id.* However, she had not experienced any seizures since taking her seizure medication (levetiracetam) one week earlier. *Id.* Dr. Kuzniecky also noted that Teresi had a history of learning disability, specifically in the field of math, and failed out of college. *Id.* Dr. Kuzniecky performed a neurological examination and found Teresi was "awake and alert" and answered questions and followed commands appropriately. *Id.* at 384. He also observed that Teresi had normal mood, affect, memory, and judgment. *Id.* Dr. Kuzniecky requested a repeat MRI, a video EEG monitoring test for pre-surgery evaluation, and a neuropsychological and psychiatric evaluation. *Id.* at 385.

### b. Opinion Evidence

#### i. Adrienne Salomon, M.D.—Treating Neurologist

On the same day as Teresi's April 19, 2017 office visit, Dr. Salomon authored a two-sentence letter update, in which she stated that Teresi is under her care for "the management of partial epilepsy" and opined that she was "currently unable to work." *Id.* at 530–31.

#### ii. Ruben Kuzniecky, M.D.— Psychiatrist

Dr. Kuzniecky administered a Physical Assessment for Determination of Employment on September 2, 2015. *Id.* at 493–95. Dr. Kuzniecky evaluated Teresi's physical exertion, finding she could lift 20 pounds occasionally and 10 pounds regularly, walk six hours per day, and push, pull, or sit without limitation.

*Id.* at 494.  Dr. Kuzniecky diagnosed Teresi with a brain tumor, epilepsy (caused by the brain tumor), and cognitive difficulties.  *Id.* at 493.  Dr. Kuzniecky also found "borderline impaired intellectual functioning" and "psychological distress."  *Id.* at 493.  Dr. Kuzniecky noted that Teresi was not capable of participating in work activities because of her "upcoming brain surgery," which was scheduled for September 22, 2015, but that he "will reassess after recovery from upcoming surgery."  *Id.* at 493–94.  There are no subsequent medical records from Dr. Kuzniecky in the administrative record.

### iii.    William Barr, M.D.—Consultative Expert

William B. Barr, Ph.D., who is board certified in clinical neuropsychology, evaluated Teresi on April 14, 2015 and completed a neuropsychological consultation report.  *Id.* at 391–94.  Barr noted that Teresi began having seizures in September or October of 2014, but that she is typically unaware of her seizures.  *Id.* at 391.  He also reported that Teresi denied any cognitive complaints at that time, although her mother reported that Teresi "cannot remember things."  *Id.*  Teresi reported feeling depressed with suicidal ideation and that she no longer sees a therapist but wanted to return to therapy.  *Id.* at 392.  Teresi also reported her learning disability, particularly in math, and that she attended three semesters of community college but was unable to pass her courses.  *Id.*  Barr found Teresi "[q]uiet at first, but [] more communicative when alone with examiner."  *Id.*  Teresi exhibited "[n]o unusual behavior," had a "f[u]ll range of appropriate affect," and was "[c]ooperative and friendly."  *Id.*  Barr found Teresi had a full-scale IQ of 75.  *Id.*  Based on the test

results, Barr noted that Teresi had "a borderline impaired level of intellectual functioning with relative weaknesses in working memory and perceptual reasoning" but demonstrated strengths in semantic abilities and motor skills. *Id.* at 394. Barr recommended Teresi gain as much independence as possible and stated that "[w]hile it may be believed that her cognitive deficits will prevent her from holding a job, Ms. Teresi presents herself in a kind and cooperative manner and will likely succeed in the correct position, even if it is part time work." *Id.* Barr also found moderate levels of anxiety and depression and suggested that Teresi may benefit from counseling to address stress management techniques. *Id.*

### iv.    Arlene Broska, M.D.—Consultative Examiner

Psychologist Arlene Broska, M.D., performed a psychiatric evaluation of Teresi on July 17, 2015. *Id.* at 484. The evaluation detailed Teresi's current functioning, including that she was anxious at home, fearful around people she with whom she is not familiar, and forgetful and easily distracted. *Id.* Dr. Broska observed that Teresi was "currently not employed" and "she stopped working due to seizures and a tumor." *Id.* She also recorded that Teresi "continues to have seizures, even though she takes her medication." *Id.* at 485. In her mental status examination, Dr. Broska found that Teresi's "demeanor and responsiveness to questions was cooperative" and "[h]er manner of relating, social skills, and overall presentation were adequate." *Id.* Dr. Broska observed Teresi's attention and concentration to be "intact" and she could do simple calculations and "count forward by 3 on her fingers." *Id.* at 486. Nonetheless, Dr. Broska noted that Teresi did not

9

have good math skills. *Id.* Dr. Broska also found that Teresi's "level of intellectual functioning was estimated to be in the average range." *Id.* With respect to Teresi's daily functioning, Dr. Broska noted that Teresi can dress and groom herself, shower with supervision, heat up food, clean, vacuum and wash her clothes, but cannot cook and has poor monetary skills. *Id.* at 486–87. Dr. Broska found that there is no evidence of "psychiatric limitations in following and understanding simple directions and instructions, performing simple or complex tasks independently, maintaining attention and concentration, learning tasks in accordance to cognitive functioning, maintain a regular schedule, and making appropriate decisions." *Id.* at 487. Dr. Broska did find "evidence of [a] mild limitation in relating adequately with others" and a "moderate limitation appropriately dealing with stress." *Id.*

Dr. Broska also opined that Teresi's psychiatric problems are not "significant enough to interfere with the claimant's ability to function on a daily basis" although "[s]eizure-related problems may cause greater limitation." *Id.* She diagnosed Teresi with an "[u]nspecified depressive disorder" and recommended "[i]ndividual psychological therapy." *Id.*

### v.   L. Hoffman—State Agency Medical Consultant

On August 6, 2015, a state agency medical consultant, Dr. L. Hoffman, reviewed the evidence in Teresi's file at that time. *Id.* at 89–105. Dr. Hoffman observed that Teresi's medically determinable impairments include seizures as the primary impairment and borderline intellectual functioning as the secondary impairment. *Id.* at 95. Both were indicated as severe. *Id.*

10

Dr. Hoffman conducted a mental residual functional capacity assessment, finding that Teresi was moderately limited in her ability to (i) understand, remember, or carry out detailed instructions, (ii) complete a normal workday and workweek without interruptions from psychologically based symptoms, and (iii) perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* at 101. Dr. Hoffman determined that Teresi was not significantly limited in her ability to (i) "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; (ii) "sustain an ordinary routine without special supervision"; (iii) "work in coordination with or in proximity to others without being distracted by them." *Id.* Dr. Hoffman also found no evidence of limitations in Teresi's ability to "understand and remember very short and simple instructions" and "make simple work-related decisions." *Id.* Teresi's intellectual functioning was estimated to be average but her IQ tests indicated borderline intellectual functioning. *Id.* at 102. Dr. Hoffman found Teresi's statements about the severity of her symptoms to be only partially credible and stated that "despite a severe impairment [Teresi] retains [her] ability to understand and follow directions, sustain attention/concentration for simple tasks, respond and relate adequately to others and adapt to simple changes." *Id.* at 103.

Dr. Hoffman determined that Teresi was limited to unskilled work because of her impairments but she was not disabled. *Id.* at 104.

11

### vi.    Rita Figueroa, M.D.—Consultative Examiner

On July 13, 2017, Rita Figueroa, M.D., performed a neurological examination of Teresi. *Id.* at 532–36. Dr. Figueroa's report details Teresi's medical history and chief complaints, as provided by Teresi and Theresa, including her history of seizures, galactosemia, learning disabilities (including difficulties with counting coins), difficulty completing chores, and a history of oppositional defiant disorder, ADHD and depression. *Id.* at 532. It was also reported that, after her surgery, Teresi "continues to have episodes where she stares off, but no frank seizures." *Id.* at 532. Dr. Figueroa detailed Teresi's "mini mental status," finding the results to be generally normal with no indication of impairments. *Id.* at 534. Dr. Figueroa diagnosed Teresi with seizures, learning disabilities, history of attention deficit disorder, history of oppositional defiant disorder, and low IQ, and gave a prognosis of "fair." *Id.* Dr. Figueroa noted in her "medical source statement" that Teresi should not drive or operate motorized machinery, and should "avoid ladders and unprotected heights due to her history of seizures." *Id.* at 534–35. Moreover, Dr. Figueroa suggested Teresi should have a psychological evaluation and possible IQ testing because Teresi "may have difficulty learning new skills, retaining information, and even working with others." *Id.* at 535. Dr. Figueroa also suggested a psychological evaluation in another portion of her report "[i]f she does not have one." *Id.* at 532.

12

### 3. ALJ Hearing

Teresi appeared before ALJ Edgell at a video conference hearing on June 9, 2017. *Id.* at 34. After being advised of her right to have an attorney, Teresi decided to proceed with the hearing unrepresented. *Id.* at 36–44. Teresi testified that she had multiple short-term jobs since her alleged onset date. Specifically, Teresi stated that she worked as a retail associate for three days but was fired because they no longer needed her. *Id.* at 48. She also stated that she worked part-time as a hostess at Ruby Tuesday but that she had quit due to transportation and home problems. *Id.* at 49. She also worked at a concession stand. *Id.* at 49–50.

Teresi testified that her doctor instructed her not to drive because of her seizure disorder, but that she has a driver's permit and would like to learn how to drive. *Id.* at 47. She stated that she is not able to work because she has "a problem with math" and "can't figure our certain tasks that are simple." *Id.* at 50. She also testified that she does not know how to cook because she never learned. *Id.*

Teresi explained that she had had brain surgery a year and a half earlier. *Id.* at 50. Since her surgery, Teresi has had staring seizures and estimated that her last seizure occurred in October or December of 2016. *Id.* at 51. She also reported having another seizure about a year before then because she forgot to take her medicine. *Id.* at 56. Teresi acknowledged that she is able to control her seizures when she takes her anti-seizure medication. *Id.* at 51. She does not think there are any side effects from taking the medication. *Id.* Teresi also stated that she takes antidepressants to help with "social problems" and reduce her anxiety and

13

depression. *Id.* at 53. Teresi testified that she previously saw a therapist but stopped and is not receiving treatment for anything else. *Id.*

Teresi testified that her normal morning involves waking up at approximately 10 a.m. or 11 a.m., using the bathroom, drinking coffee, and checking her phone. *Id.* She exchanges text messages with whoever will talk to her. *Id.* She described that she does not have a boyfriend but does have friends or people with whom she socializes, noting that "sometimes they just don't want to hang out." *Id.* at 54. Teresi stated that she enjoys social media, movies, shows, hanging out with friends, bowling, and going out to eat. *Id.* at 54–55. She also shops and exercises. *Id.* With respect to household chores, Teresi testified that she cleans, does laundry, makes her bed, and vacuums. *Id.* at 54. Teresi also stated that she has learning disabilities and feels like everybody learned faster than her at school. *Id.* at 55. She told the ALJ that her learning disabilities were the reason why she never graduated college. *Id.* at 55–56.

Teresi's mother, Theresa, also testified as to Teresi's disabilities and the scope of her limitations. *Id.* at 58–63. Theresa reported that Teresi has a learning disability that makes it "very difficult for her to understand what you're asking her to do." *Id.* at 58. Theresa explained that Teresi does not have the attention span for certain tasks. *Id.* For example, Teresi could perform a task to "bring this package over there" but could not "[b]ring the packages here, and there, and there." *Id.* Theresa also testified that she needs to follow up with Teresi after giving her instructions. *Id.*

14

Theresa stated that Teresi has anxiety and "things scare her." *Id.* at 59.
Theresa also testified that Teresi cannot cook or even cut onions, and that she is
afraid Teresi will hurt herself. *Id.* at 60. Theresa observed that Teresi has no
friends and does not know how to make friends. *Id.* According to Theresa, if Teresi
is "in a crowd of people, she'll be off to the side, by herself, like an introvert." *Id.*

Theresa explained that Teresi would have 15 or 20 seizures per day prior to
her surgery. *Id.* at 61. When asked about Teresi's improvement since the surgery
and being relatively seizure-free, Theresa testified that Teresi has had no
improvement in taking care of herself, cooking, math, or counting change. *Id.* at
61–62. She explained that Teresi just recently learned the difference between
pennies, nickels, and dimes. *Id.* at 62. Theresa also stated that she or another
member of the family had to drive Teresi to community college. *Id.* at 62–63.

Andrew Pasternak, a vocational expert, also testified at the hearing. The
ALJ queried whether there would be any jobs if a person was limited to "light work,
no hazards, simple repetitive tasks, no math or money, and no multitasking." *Id.* at
65. Pasternak identified three types of jobs: assembly jobs, a checker (or inspection)
job, and a wrapping machine tender job. *Id.* at 65–66. Pasternak also testified that
a person could not be competitively employed if that person was off-task in excess of
20 percent of the day or absent four times a month. *Id.* at 66.

## II. DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of Commissioner's Determinations

An individual may obtain judicial review of a final decision of the Commissioner in the "district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision applied the correct legal standards and whether it is supported by substantial evidence. *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (internal quotation marks and alterations omitted); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high").

The substantial evidence standard is a "very deferential standard of review." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." *DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v. Sullivan*, 949

F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted).

"[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable

factfinder would have to conclude otherwise.'" *Brault*, 683 F.3d at 448 (quoting

*Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

In weighing whether substantial evidence exists to support the

Commissioner's decision, "the reviewing court is required to examine the entire

record, including contradictory evidence and evidence from which conflicting

inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722

F.2d 1033, 1038 (2d Cir. 1983)).  On the basis of this review, the court may "enter,

upon the pleadings and transcript of the record, a judgment affirming, modifying, or

reversing the decision of the Commissioner of Social Security, with or without

remanding . . . for a rehearing."  42 U.S.C. § 405(g).  However, "[w]hen there are

gaps in the administrative record or the ALJ has applied an improper legal

standard, [the court has], on numerous occasions, remanded to the [Commissioner]

for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir.

1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in

original).

## 2.  Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A).  Physical

or mental impairments must be "of such severity that [the claimant] is not only

unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the

national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

In assessing a claimant's impairments and determining whether they meet

the statutory definition of disability, the Commissioner "must make a thorough

inquiry into the claimant's condition and must be mindful that 'the Social Security

Act is a remedial statute, to be broadly construed and liberally applied.'"  *Mongeur*,

722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)).

Specifically, the Commissioner's decision must take into account factors such as:

"(1) the objective medical facts; (2) diagnoses or medical opinions based on such

facts; (3) subjective evidence of pain or disability testified to by the claimant or

others; and (4) the claimant's educational background, age, and work experience."

*Id.*  (citations omitted).

### a.  Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential

evaluation process' to determine whether a claimant is disabled[.]"  *Estrella v.

Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R.

§ 404.1520(a)(4).  First, the Commissioner must establish whether the claimant is

presently employed.  20 C.F.R. § 404.1520(a)(4)(i).  If the claimant is unemployed,

the Commissioner goes to the second step and determines whether the claimant has

18

a "severe" impairment restricting her ability to work.  20 C.F.R. § 404.1520(a)(4)(ii).

If the claimant has such an impairment, the Commissioner moves to the third step

and considers whether the medical severity of the impairment "meets or equals" a

listing in Appendix One of Subpart P of the regulations.  20 C.F.R.

§ 404.1520(a)(4)(iii).  If so, the claimant is considered disabled.  *Id.*; 20 C.F.R.

§ 404.1520(d).  If not, the Commissioner continues to the fourth step and

determines whether the claimant has the residual functional capacity ("RFC") to

perform her past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  Finally, if the

claimant does not have the RFC to perform past relevant work, the Commissioner

completes the fifth step and ascertains whether the claimant possesses the ability to

perform any other work.  20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps.  *Burgess v. Astrue*, 537

F.3d 117, 128 (2d Cir. 2008).  If the claimant is successful, the burden shifts to the

Commissioner at the fifth and final step, where the Commissioner must establish

that the claimant has the ability to perform some work in the national economy.

*See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b.  Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial."  *Sims*

*v. Apfel*, 530 U.S. 103, 110–11 (2000).  Consequently, "the social security ALJ,

unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop

the record in light of the essentially non-adversarial nature of a benefits

proceeding."  *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation

marks omitted).  As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits."  *Sims*, 530 U.S. at 111.  Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history.  *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)).  This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity."  *Pena v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question.  Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record."  *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also Rodriguez v. Barnhart*, No. 02-CV-5782 (FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing *Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)).  The ALJ must develop the record even where the claimant has legal counsel.  *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  Remand is appropriate where this duty is not discharged.  *See, e.g., Moran*,

569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

### c. Treating Physician's Rule

"Regardless of its source, the ALJ must evaluate every medical opinion in determining whether a claimant is disabled under the [Social Security] Act." *Pena ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(c), 416.927(d)) (internal quotation marks omitted).[6]  A treating physician's opinion is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).  The regulations define a treating physician as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1502.  Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal

---

[6] The 2017 revisions included modifying 20 C.F.R. § 404.1527 to clarify and add definitions for how to evaluate opinion evidence for claims filed before March 27, 2017.  *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).  Accordingly, this opinion and order applies the regulations that were in effect when Teresi's claims were filed with the added clarifications provided in the 2017 revisions.

picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical evidence alone or from reports of individual examinations."  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2).

A treating physician's opinion is not always controlling.  For example, a legal conclusion "that the claimant is 'disabled' or 'unable to work' is not controlling," because such opinions are reserved for the Commissioner.  *Guzman v. Astrue*, No. 09-CV-3928 (PKC), 2011 WL 666194, at *10 (S.D.N.Y. Feb. 4, 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)); *accord Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating physician's statement that the claimant is disabled cannot itself be determinative.").  Additionally, where "the treating physician issued opinions that [were] not consistent with other substantial evidence in the record, such as the opinion of other medical experts, the treating physician's opinion is not afforded controlling weight."  *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)) (internal quotation marks omitted) (alteration in original); *see also Snell*, 177 F.3d at 133 ("[T]he less consistent [the treating physician's] opinion is with the record as a whole, the less weight it will be given.").

Importantly, however, "[t]o the extent that [the] record is unclear, the Commissioner has an affirmative duty to 'fill any clear gaps in the administrative record' before rejecting a treating physician's diagnosis."  *Selian*, 708 F.3d at 420 (quoting *Burgess*, 537 F.3d at 129); *see Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir.

22

1998) (discussing ALJ's duty to seek additional information from treating physician

if clinical findings are inadequate).  As a result, "the 'treating physician rule' is

inextricably linked to a broader duty to develop the record.  Proper application of

the rule ensures that the claimant's record is comprehensive, including all relevant

treating physician diagnoses and opinions, and requires the ALJ to explain clearly

how these opinions relate to the final determination." *Lacava v. Astrue*, No. 11-CV-

7727 (WHP) (SN), 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012) ("In this

Circuit, the [treating physician] rule is robust."), *adopted by* 2012 WL 6621722 (Dec.

19, 2012).

        To determine how much weight a treating physician's opinion should carry,

the ALJ must consider the so-called "*Burgess* factors" outlined by the Second

Circuit:

> (i) the frequency of examination and the length, nature
> and extent of the treatment relationship; (ii) the evidence
> in support of the treating physician's opinion; (iii) the
> consistency of the opinion with the record as a whole; (iv)
> whether the opinion is from a specialist; and (v) other
> factors brought to the Social Security Administration's
> attention that tend to support or contradict the opinion.

*Halloran*, 362 F.3d at 32 (citation omitted); *see also Burgess,* 537 F.3d at 129; 20

C.F.R. § 404.1527(c)(2).  This determination is a two-step process.  "First, the ALJ

must decide whether the opinion is entitled to controlling weight." *Estrella*, 925

F.3d at 95.  Second, if, based on these considerations, the ALJ declines to give

controlling weight to the treating physician's opinion, the ALJ must nonetheless

"comprehensively set forth reasons for the weight" ultimately assigned to the

treating source. *Halloran*, 362 F.3d at 33; *accord Snell*, 177 F.3d at 133 (responsibility of determining weight to be afforded does not "exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited") (referring to *Schaal*, 134 F.3d at 505 and 20 C.F.R. § 404.1527(d)(2)).  If the ALJ decides the opinion is not entitled to controlling weight, "[a]n ALJ's failure to 'explicitly' apply these '*Burgess* factors' when [ultimately] assigning weight at step two is a procedural error." *Estrella*, 925 F.3d at 96 (quoting *Selian*, 708 F.3d at 419–20).  The regulations require that the SSA "always give good reasons in [its] notice of determination or decision for the weight" given to the treating physician. *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (alteration in original) (citations omitted).  Indeed, "[c]ourts have not hesitate[d] to remand [cases] when the Commissioner has not provided good reasons." *Pena ex rel. E.R.*, 2013 WL 1210932, at *15 (quoting *Halloran*, 362 F.3d at 33) (second and third alteration in original) (internal quotation marks omitted).

### d.  Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006).  "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting *Aponte v. Sec'y of Health and Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)).  Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity

to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)).  "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'"  *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)).  Accordingly, the ALJ must follow a two-step framework for evaluating allegations of pain and other limitations.  *Id.*  First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)).  "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record."  *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or

> other symptoms; 6. [a]ny measures other than treatment
> the individual uses or has used to relieve pain or other
> symptoms (e.g., lying flat on his back, standing for 15 to
> 20 minutes every hour, or sleeping on a board); and 7.
> [a]ny other factors concerning the individual's functional
> limitations and restrictions due to pain or other
> symptoms.

*Pena*, 2008 WL 5111317, at *11 (citing SSR 96-7p, 1996 WL 374186, at *3 (SSA July

2, 1996)).

**B. The ALJ's Decision**

In her March 15, 2018 decision, the ALJ concluded that Teresi was not

disabled as defined by the Social Security Act.  AR at 27.  As an initial matter, the

ALJ found that Teresi had not attained age 22 as of May 21, 2014, the alleged onset

date, as required to claim childhood benefits.  *Id.* at 21; *see* 20 C.F.R.

§ 404.350(a)(5).  Following the five-step inquiry, at step one the ALJ found that

Teresi had not been engaged in substantial gainful activity since May 21, 2014, the

alleged onset date of Teresi's impairments.[7]  AR at 21.  At step two, the ALJ found

that Teresi's severe impairments included a history of learning disorder,

intellectual disorder, neuroepithelial tumor, affective/anxiety disorder, and seizure

disorder.  *Id.*  The ALJ found that Teresi's hemorrhoids and galoctosemia were non-

severe impairments "because there is no evidence in the record that they have more

---

[7] As previously noted, Teresi alleges an onset date of May 8, 2015 in her application.
The ALJ set May 21, 2014 as the onset date, which is one day after Teresi's first
application was denied.  AR at 18.  Neither party appears to object.  *See* Pl. Mem. at
1; Def. Opp. at 1, n.1.  For purposes of this opinion and order, the Court assumes
that the alleged onset date is May 21, 2014.

than a minimal effect on the claimant's ability to do basic work activities." *Id.*  In

reaching this conclusion, the ALJ noted that the impairments were "being managed

medically" and "should be amenable to proper control by complying with

recommended treatment" as "no aggressive treatment was recommended or

anticipated for these conditions." *Id.*

At step three, the ALJ found that none of Teresi's impairments, singly or in

combination, met or equaled the medical severity in Listing 11.02, 11.03, 12.04,

12.05, or 12.06 in Appendix One of Subpart P of the regulations.  20 C.F.R. Part

404, Subpart P, Appendix 1, §§ 11.02, 11.03, 12.04, 12.05, 12.06.  With respect to

Listing 11.02, the ALJ found that Teresi did not have seizures occurring at least

once a month in spite of three months of treatment as required under that Listing.

*Id.* at 21.  With respect to Listing 11.03, the ALJ found that Teresi did not have

seizures occurring more frequently than once weekly in spite of at least three

months of prescribed treatment.  *Id.*[8]  The ALJ also determined that Teresi did not

---

[8] Since the ALJ's decision, Listing 11.03 has become obsolete.  *See* SSA Program
Operations Manual System, DI 34131.000 Obsolete Neurological Listings for
01/06/86 to 09/28/16, available at
https://secure.ssa.gov/apps10/poms.nsf/lnx/0434131013; SSA Program Operations
Manual System, DI 34131.013 Neurological Listings for 12/15/2004 to 09/28/16,
available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0434131013 (showing
Listing 11.03 was valid between December 15, 2009 and September 28, 2016).
However, as other courts have noted, the criteria of now-obsolete Listing 11.03 is
incorporated into Paragraph B criteria of Listing 11.02.  *See, e.g., Worley v.
Berryhill*, No. 7:18-CV-16-FL, 2019 WL 1272540, at *5 (E.D.N.C. Feb. 4,
2019),  ("Inclusion of the paragraph B criteria concerning dyscognitive seizures–
those characterized by alteration of consciousness without convulsions or loss of
muscle control–effectively incorporates the now obsolete Listing 11.03[.]"), *adopted
by* 2019 WL 1264870 (E.D.N.C. Mar. 19, 2019).

meet the paragraph B criteria under Listings 12.04, 12.05, and 12.06, which requires a finding of at least one extreme limitation or two marked limitations in the four mental functioning areas listed. *Id.* at 22. Specifically, the ALJ found that Teresi had a moderate limitation in the first and third functional areas (understanding, remembering, or applying information and concentrating, persisting, or maintaining pace) and a mild limitation in the second and last functional areas (interacting with others and adapting or managing oneself). *Id.* Because the ALJ did not find at least one extreme limitation or two marked limitations in Teresi's mental impairments in these categories, the ALJ determined that Teresi did not satisfy the paragraph B criteria in Listings 12.04, 12.05, and 12.06. *Id.* The ALJ also found additional independent reasons why Teresi did not satisfy those listings. For example, the ALJ concluded that Teresi did not satisfy Listing 12.05(B)(1)(b) because "she does not present with an accompanying verbal or performance IQ score of 70 or below on an individually standardized test of general intelligence." *Id.* at 21. The ALJ also determined that Teresi did not satisfy the paragraph C criteria for Listings 12.04 and 12.06 because the evidence failed to establish a serious and persistent mental disorder with a highly structured setting and marginal adjustment. *Id.* at 22–23.

Prior to evaluating step four, the ALJ determined Teresi's RFC. *Id.* at 14–15. She concluded that Teresi could "perform light work" and "simple and repetitive tasks[] that do not require multitasking, math, or handling money" but that Teresi should avoid hazards. *Id.* at 23. In formulating this RFC, the ALJ evaluated

Teresi's allegations and testimony and determined that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Teresi's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the [evidence in the record]." *Id.* at 24. The ALJ provided several reasons for this finding, including that Teresi's daily activities were not consistent with the symptoms and limitations she alleged, that Teresi's treatment since her surgery has been routine with no recommendations for remarkable treatment, and that the record does not contain any non-conclusory opinions that indicates Teresi is currently disabled. *Id.* at 24. Moreover, ALJ found that Teresi's seizure disorder "has gotten better with medication management" and there "has been no worsening of [Teresi's] physical and mental impairments." *Id.* at 26.

The ALJ also summarized Teresi's treatment history and weighed the opinions of medical sources to reach her RFC finding. *Id.* at 24–26. The ALJ found that the opinions of treating source Dr. Kuzniecky were entitled to "some weight." *Id.* at 25. The ALJ found that Dr. Kuzniecky's opinion of Teresi's exertional ability was consistent with the record and, therefore, entitled to "great weight," but his opinion that Teresi was "unable to work" due to her upcoming surgery was a "temporary assessment, of little current probative value" and an "issue reserved to the Commissioner" that is not entitled to "any special significant weight." *Id.* at 25.

The ALJ found Dr. Salomon's opinion in her April 17, 2018 letter to have no "special significant weight." *Id.* at 25. In making this finding, the ALJ found that

29

Dr. Salomon's opinion that Teresi was "under her care for management of partial epilepsy and currently unable to work" was "not a medical opinion," but instead an issue reserved to the Commissioner.  *Id.*

The ALJ assigned "great weight" to Dr. Figueroa's opinion as to Teresi's limitations and abilities in light of her seizure history.  In particular, the ALJ found that Dr. Figueroa, whom the ALJ described as "a specialist in neurology," "perform[ed] a detailed examination of [Teresi]" and provided an opinion that was "consistent with the record as a whole" and "supported with relevant evidence."  *Id.* at 25–26.

The ALJ accorded "partial weight" to the opinion of Dr. Broska.  *Id.* at 24.  The ALJ determined that, although Dr. Broska's opinion that Teresi's psychiatric issues did not appear significant enough to interfere with her ability to function on a daily basis was consistent with her examination findings, the evidence in the record indicated that Teresi's psychiatric issues imposed "greater limits."  *Id.* at 24.  In support of this finding, the ALJ cited to Dr. Kuzniecky's opinion, Dr. Broska's opinion, and Dr. Figueroa's opinion.  *Id.*

The ALJ assigned "some weight" to the opinion of Dr. Hoffman.  *Id.* at 26.  The ALJ found that Dr. Hoffman's opinion that Teresi had a mild limitation in restriction of activities of daily living and maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace was consistent with the medical record at that time and "not significantly contradicted by any evidence since then."  *Id.*

30

At step four, the ALJ found that Teresi had no past relevant work. *Id.* at 26.

At step five, after considering the testimony of the vocational expert and Teresi's demographic information, the ALJ concluded that there were jobs that exist in significant numbers that she could perform, such as small products assembler, checker, and machine tender wrapper. *Id.* at 27. Accordingly, the ALJ concluded that Teresi was not disabled from May 21, 2014 through the date of her decision. *Id.* at 27.

## C. Analysis

Teresi contends that this case should be remanded for three reasons. First, she argues that the ALJ did not properly evaluate lay witness testimony—*i.e.*, the testimony of Teresi and her mother—and erred in finding Teresi "not totally credible." Pl. Mem. at 18–20. Next, Teresi contends that the ALJ failed to correctly weigh the medical evidence and violated her duty to develop the record with respect to the opinions of Drs. Salomon and Kuzniecky. *Id.* at 20–23. Third, Teresi argues that the case should be remanded and Teresi's first CDB and SSI application, filed in September 24, 2012, be reopened because ALJ Katz's decision denying that application was "infected by clear error of law." *Id.* at 23–24. The Commissioner counters that the ALJ's decision is legally correct and supported by substantial evidence, and that any errors committed by the ALJ should be considered harmless given the overall record. Def. Mem. at 13–23. The Commissioner also argues that the denial of Teresi's prior application should not be reopened as the Court lacks jurisdiction to do so. *Id.* at 24–25.

### 1. Lay Witness Testimony

Teresi argues first that the ALJ failed to properly evaluate the testimony of Teresi and Teresi's mother, Theresa.  First, Teresi argues that the ALJ improperly "cut[] [Theresa's] testimony short" even though "it was clear that [Theresa] had more to say," and then "failed to evaluate or discuss the testimony" in her decision. *Id.* at 5, 18–19.  Specifically, Teresi contends that the ALJ ignored Theresa's testimony about Teresi's impairments "that encompassed six (6) typewritten pages," and instead focused only on Theresa's testimony that Teresi had no friends (which was inconsistent with Teresi's).  Pl. Reply at 8.  Next, Teresi argues that the ALJ erred by finding that Teresi was not completely credible because (1) Theresa's statements "corroborate[] [Teresi's] testimony" (Pl. Mem. at 20); and (2) the ALJ improperly "picked and chose snippets of evidence" that tended to support her RFC finding, and ignored evidence that contradicted it (Pl. Reply at 8–9).

In response, the Commissioner contends that the ALJ considered both Teresi's and Theresa's testimony but found inconsistencies and contradicting evidence that undermined their credibility.  Def. Mem. at 21.  For example, the Commissioner claims that Teresi's allegations of the severity of her impairments (namely, anxiety and depression, history of learning disorder, and cognitive impairment) were undermined by medical evidence, including evidence that demonstrated her "seizure disorder was improved on medication."  *Id.* at 21.  Moreover, the Commissioner points to the inconsistencies among lay witness testimony and record evidence which "failed to corroborate Plaintiff's and her

mother's claims of disability." *Id.* The Commissioner argues that the ALJ "plainly considered" the testimony of Theresa and Teresi but found it not completely credible based on the record. *Id.* at 22. The Commissioner argues that the ALJ was not required to "parse and expressly comment on every aspect" of the lay witness testimony, and that the ALJ's conclusions regarding the lay witnesses is supported by the record. *Id.*

### a. The ALJ Properly Evaluated Theresa's Testimony and Credibility

As a threshold matter, Teresi's argument that the ALJ improperly cut off Theresa's testimony is contradicted by the hearing transcript. In support of her argument, Teresi cites a portion of the transcript towards the end of Theresa's testimony:

> WTN: Okay. Is there any more I could say, or no?
> ALJ: Well, I got the gist of what you're saying.
> WTN: I mean, that thing, like also her – it's called something.
> ALJ: All right, ma'am, okay, thank you. Yeah, I got your testimony, I don't need your diagnosis.
> WTN: I mean, just that thing about – I didn't want her to do this today. And I actually did speak to the lawyer, but the truth is she wants to.

AR at 63; *see* Pl. Mem. at 5, n.3 (citing AR at 63).

Although this portion of the transcript establishes that the ALJ stopped her testimony, Theresa continued to speak after this exchange. *See* AR at 63. This is not an instance in which the ALJ cut off relevant testimony or questioned Theresa in a manner that elicited brief responses, thereby violating the ALJ's duty to develop the record. *See, e.g., Thibodeau v. Comm'r of Social Sec.*, 339 F. App'x 62, 64 (2d Cir. 2009) (remanding case where ALJ cut short testimony, diverted inquiry

from relevant considerations, and asked "strikingly terse and negatively phrased" questions that "elicit[ed] brief responses rather than elaboration from [plaintiff]"). Rather, the hearing transcript establishes that the ALJ asked open-ended questions throughout Theresa's testimony and sought to elicit any relevant information about Teresi's impairments. *See, e.g.,* AR at 57 ("what have you observed about your daughter, with your own eyes, relative to her ability to work?"); *id.* at 58 ("If I offered her a job tomorrow, you know, an easy job, why couldn't your daughter do a job?"); *id.* at 59 ("So just tell me about the things that are relevant to a person's ability to work."); *id.* ("Don't tell me the diagnosis, tell me what you notice about your daughter that is her function."). Accordingly, Teresi's argument that the ALJ violated her duty to develop the record by cutting off Theresa's testimony is without merit. *See, e.g., Buck v. Colvin*, No. 14-CV-216S (WMS), 2015 WL 4112470, at *6 (W.D.N.Y. July 8, 2015) (rejecting plaintiff's argument that ALJ improperly cut off testimony where plaintiff was "given ample opportunity to detail how and why she was disabled").

It is also clear from the record that the ALJ properly evaluated Theresa's testimony and identified certain inconsistencies. AR at 22. Social Security Rule 06–03 provides that opinions from non-medical sources "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06–03p; Titles II and XVI: *Considering Opinions and Other Evidence From Sources Who Are Not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on*

*Disability by Other Governmental and Nongovernmental Agencies*, 71 Fed. Reg. 45593, 2006 WL 2263437 (Aug. 9, 2006).  In deciding how much weight to give non-medical sources who have not seen the individual in a professional capacity, such as parents, the ALJ is instructed to consider "such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence." *Id.*

Here, the ALJ reviewed Theresa's testimony and discounted portions of it as inconsistent with other evidence in the record: "The claimant's mother testified that the claimant has no friends, but the claimant testified that she has friends with whom she socializes and texts . . . [and] progress notes indicate the claimant has a boyfriend." *Id.*  At the same time, contrary to Teresi's contention that the ALJ only focused on Theresa's inconsistent testimony (Pl. Reply at 8), the ALJ considered and relied on portions of Theresa's testimony that were consistent with the record.  For instance, the ALJ relied on Theresa's testimony that Teresi "has a poor attention span and accordingly does not finish her chores," ultimately finding that Teresi has "a moderate limitation in concentrating, persisting, or maintaining pace." *Id.* at 22.[9]  Teresi correctly points out that the ALJ's decision did not directly refer to the parts of Theresa's testimony about Teresi's learning disability (*id.* at 58), anxiety (*id.* at 59), inability to cook (*id.*), avoidance of hazards like knives (*id.* at 60), introversion (*id.*), difficulties with math (*id.* at 62), and inability to drive (*id.*).  Pl.

---

[9] The ALJ cited record evidence that established Teresi had "normal results in concentration upon testing" but nonetheless found a moderate limitation, presumably based on the testimony of Teresi and Theresa.  AR at 22.

Reply at 8.  But these omissions do not justify a remand.  It is clear that the ALJ made findings consistent with Theresa's testimony on most of these topics without referring to her testimony.  For example, in describing Teresi's RFC, the ALJ stated that Teresi can perform "simple and repetitive tasks" that do not require math and that Teresi could perform light work "except claimant should avoid hazards" (AR at 23), which is consistent with Theresa's testimony about Teresi's learning disability and avoidance of hazards (*id.* at 58, 60).  The ALJ also found that Teresi could travel independently but lacks the funds to do so (*id.* at 22), which is consistent with Theresa's testimony that someone had to drive Teresi to school every time (*id.* at 62–63) and Teresi's testimony that she could travel independently if she had money to pay for an Uber (*id.* at 47).  It is not necessary for the ALJ to address every aspect of Theresa's testimony when the Court can "glean the rationale of [the] ALJ's decision" based on the record.  *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (denying remand where certain testimony not directly addressed but clear from record that ALJ considered and simply discounted such testimony).[10]   In light of the record, any error in failing to refer explicitly to all of Theresa's

---

[10] Even if the ALJ did not fully consider Theresa's testimony, such an error would not affect the ALJ's disability finding, where Theresa's testimony largely mirrored Teresi's.  *Compare* AR at 50 (Teresi testified that she has "a problem with math" and "can't figure out certain tasks that are simple") and *id.* at 52 (Teresi testified she is not allowed to drive) *with id.* at 58, 62 (Theresa testified that Teresi "can't do math" or understand instructions) and *id.* at 62–63 (Theresa testified she or another person drove Teresi to college); *see Wettlauder v. Colvin*, 203 F. Supp. 2d 266, 281 (E.D.N.Y. 2002) (ALJ's failure to mention testimony of plaintiff's husband was harmless error, where it echoed plaintiff's own testimony and no aspect of it would affect disability determination).

testimony is harmless, at most.  *See e.g., Phelps v. Colvin*, 20 F. Supp. 3d 392, 404

(W.D.N.Y. 2014) (failure to assign specific weight to lay witness opinion harmless

error).  Accordingly, the ALJ did not err in evaluating Theresa's testimony and

finding it not to be fully credible.

### b.  The ALJ Properly Evaluated Teresi's Credibility

Teresi's argument that the ALJ erred by finding Teresi not entirely credible

is also unpersuasive.  *See* Pl. Mem. at 20.  The ALJ found that Teresi suffers from a

medically determinable impairment that could reasonably be expected to produce

the symptoms alleged, but discredited Teresi's allegations concerning the severity of

her impairments as not entirely supported by the record.  AR at 24.  As required,

the ALJ considered objective medical evidence and other evidence in the record and

offered the specific reasons why she discredited Teresi's allegations that she had

debilitating symptoms.  *See, e.g., Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)

("[T]he ALJ must consider 'the extent to which [the claimant's] symptoms can

reasonably be accepted as consistent with the objective medical evidence and other

evidence' of record.") (citing 20 C.F.R. § 404.1529(a)).

First, the ALJ concluded that Teresi described daily activities that were not

limited to the extent one would expect given the alleged symptoms and limitations.

*Id.* at 23–24 (Teresi gets up at 10 a.m., checks her phone, texts and hangs out with

her friends, bowls and performs household chores, including cleaning, doing

laundry, and vacuuming).  Teresi's own testimony as to her daily chores and social

activities supports this finding.  *See id.* at 53–55.  For example, Teresi testified that

she could not "figure out certain tasks that are simple" (*id.* at 50); however, several opinions in the record, including her mother's, indicate that Teresi is capable of performing simple tasks (*see, e.g., id.* at 487 (Dr. Broska found no evidence of limitations in following and understanding simple directions or performing simple tasks); *id.* at 101 (Dr. Hoffman found that Teresi can understand short and simple instructions and make simple work-related decisions); *id.* at 58 (Theresa described Teresi's ability to perform a simple, one-step task, but not more complex tasks)).

Next, the ALJ found that Teresi's symptoms were not as severe as alleged because treatment since her surgery has been routine without "remarkable treatment recommendations," which the ALJ found to be consistent with Teresi's testimony that she suffered from one seizure after her surgery and currently takes medication without any side effects. *Id.* at 24. The record also supports this finding. *Id.* at 620 (Dr. Salomon's treatment notes dated November 16, 2015, which state that Teresi has been "seizure free" since her surgery); *id.* at 584 (Dr. Salomon's treatment notes dated December 5, 2016 stating that Teresi has been "seizure free" since last visit); *id.* at 51 (Teresi acknowledges that her anti-seizure medication controls her seizures when she takes it).

Finally, the ALJ found that the record does not contain any medical evidence (other than conclusory opinions) that support Teresi's allegations that her impairments render her disabled. *Id.* at 24. Besides the opinions of Dr. Salomon and Dr. Kuzniecky that Teresi is not able to work, to which the ALJ owed no deference as a matter of law, the record does not establish sufficient evidence to

support the disabling symptoms alleged by Teresi.  Accordingly, the ALJ properly

evaluated Teresi's credibility. *See, e.g., Meyer v. Comm'r of Soc. Sec.*, 794 F. App'x

23, 26 (2d Cir. 2019) (deferring to ALJ's decision as to claimant's credibility where

ALJ analyzed daily activities, course of treatment, and medical evidence to find

claimant not "wholly credible").

Teresi does not address this evidence directly, but instead argues that the

ALJ improperly "picked and chose snippets of evidence" that tended to support her

RFC finding, and ignored evidence that contradicted it. Pl. Reply at 9 (citing

*Montanez v. Berryhill*, 334 F. Supp. 3d 562, 565 (W.D.N.Y. 2018)).  In *Montanez*, the

court found that remand was warranted because "the ALJ improperly cherry-picked

the record" by accepting evidence that the plaintiff had a moderate limitation based

on the "totality of the record" (without describing the specific evidence), while

rejecting medical opinion evidence that found greater limitations without

"sufficiently explain[ing] his decision *not* to credit any of the evidence of *greater*

than moderate limitations."  *Id.* at 564–65.  Unlike in *Montanez*, the ALJ here

identified the evidence in support of her decision and explained the reason why she

did not credit evidence that indicated greater limitations.  *See, e.g.,* AR at 25 ("[Dr.

Kuzniecky's] opinion that the claimant was 'unable to work' . . . is a temporary

assessment, of little current probative value" and "Dr. Salomon's statement

indicating the claimant is 'disabled' is not a medical opinion, but rather an

administrative finding dispositive of a case" and both are issues reserved to the

Commissioner).  In fact, the ALJ assigned only partial weight to Dr. Broska's report

because her findings went against the record, which establishes that Teresi had greater limitations.  *Id.*

In sum, the ALJ properly evaluated the lay witness testimony and did not err in finding that Teresi's allegations as to the severity of her symptoms were not entirely credible.

### 2.  The ALJ Properly Evaluated the Opinion Evidence

Teresi also argues that the ALJ assigned the opinions of Dr. Figueroa, Dr. Broska, and Dr. Hoffman more weight than they deserved.  Pl. Mem. at 21–22; Pl. Reply at 2, 4–7.  The Court will address each weight determination in turn.

### a.  Dr. Rita Figueroa

Teresi argues that the ALJ erred by giving Dr. Figueroa's opinion "great weight" because (i) the ALJ mistakenly believed that Dr. Figueroa is a neurologist, when in fact she is a general surgeon or internal medicine doctor (Pl. Mem. at 21); (ii) Dr. Figueroa is a consultative examiner and her findings were based on one examination and Teresi's self-reported medical history (Pl. Mem. 21; Pl. Reply 6–7); (iii) Dr. Figueroa expressed uncertainty about Plaintiff's mental status by recommending a psychological evaluation and IQ test and suggesting that Teresi may have difficulties "learning new skills, retaining information, and even working with others" (Pl. Mem. 21; Pl. Reply 6–7); and (iv) the opinion was devoid of an RFC statement and did not address the extent of Teresi's neurological impairments (Pl. Mem. at 21).  In response, the Commissioner contends that misidentification of Dr. Figueroa's specialty is harmless error because the ALJ provided other reasons for

assigning "great weight" to Dr. Figueroa's opinion. Def. Mem. at 16–17. In addition, the Commissioner argues that Dr. Figueroa's opinion is well-supported by the record and the ALJ's overall RFC determination is supported by substantial evidence. *Id.* at 15–17.

The Court concludes that the ALJ did not err in assigning "great weight" to Dr. Figueroa. First, although the ALJ incorrectly described Dr. Figueroa as "a specialist in neurology," AR at 25–26, the ALJ also reasoned that Dr. Figueroa's opinion deserved "great weight" because it was "consistent with the record as a whole, and was supported with relevant evidence." *Id.* Upon review of the record, there is substantial evidence to support Dr. Figueroa's opinion. For instance, Dr. Figueroa's findings that Teresi should not drive or operate motorized machinery and should avoid ladders and unprotected heights due to her history of seizures is supported by both testimony and medical evidence. *Id.*; *see, e.g., id.* at 47, 52 (Teresi stated that she cannot drive due to her seizures); *id.* at 363 (Dr. Salomon directed Teresi not to drive given her condition); *id.* at 385 (Dr. Kuzniecky instructed Teresi not to drive). Moreover, there is also substantial evidence to support other portions of Dr. Figueroa's opinion, including mental and physical examination findings and Dr. Figueroa's diagnoses of seizures, learning disabilities, history of attention deficit disorder and oppositional disorder, and low IQ. *See, e.g., id.* at 534; *id.* at 382–84 (Dr. Kuzniecky noted Teresi's history of learning disability and, based on his neurological examination, found normal mood, affect, memory, and judgment); *id.* at 494 (Dr. Kuzniecky diagnosed epilepsy and borderline

impaired intellectual functioning); *id.* at 394 (Dr. Barr diagnosed borderline impaired level of intellectual functioning).  This is thus not a case where the ALJ's only basis for assigning weight was based on a mischaracterization.  *See, e.g., Newsome v. Astrue*, 817 F. Supp. 2d 111, 129 (E.D.N.Y. 2011) (ALJ decision not supported by substantial evidence where "only stated basis" for rejecting treating physician's opinion based on ALJ's own mischaracterization of treating physician's report).  Instead, the ALJ provided other bases for assigning "great weight" to Dr. Figueroa's opinion, which are supported by the record.  Therefore, while the ALJ erred in characterizing Dr. Figueroa's specialty, it is not an error warranting remand.

Second, Teresi's argument that the ALJ cannot rely heavily on Dr. Figueroa's opinion because she is a consultative examiner that performed only one examination of Teresi lacks merit.  Courts have held that a consulting examiner's opinion may be accorded "great weight" and may serve as substantial evidence in support of an ALJ's decision.  *See, e.g., Colbert v. Comm'r*, 313 F. Supp. 3d 562, 577 (S.D.N.Y. 2018) (no error by according "great weight" to consultative examiner's opinion where opinion supported by record) (collecting cases); *Martes v. Comm'r*, 344 F. Supp. 3d 750, 764–65 (S.D.N.Y. 2018) (record supported decision to assign "great weight" to consulting examiner's opinion given its consistency with record); *Mayor v. Colvin*, No. 15 CIV. 0344 (AJP), 2015 WL 9166119, at *18 (S.D.N.Y. Dec. 17, 2015) ("It is well-settled that a consulting physician's opinion can constitute substantial evidence supporting an ALJ's conclusions.").  Although the fact that a

consulting examiner's opinion was based on one examination is a relevant factor in assigning weight, it does not "render a consulting opinion valueless." *Colbert*, 313 F. Supp. 3d at 577 (no error in according "great weight" to consulting psychiatrist's opinion, rendered after one examination, given consistency with record evidence); *Mayor*, 2015 WL 9166119, at *18 (same).  Here, the ALJ observes that Dr. Figueroa performed a "detailed examination" of Teresi.  AR at 26.  While Dr. Figueroa's opinion is only four pages, it is comprehensive, covering Teresi's self-reported complaints and medical history, medication, activities of daily life, physical and mental functions, diagnoses, and limitations of her impairments.  AR at 532–35. Moreover, as previously discussed, Dr. Figueroa's opinion is consistent with, and supported by, the record.

Next, Teresi's argument that Dr. Figueroa's opinion deserved less weight because she relied on Teresi's self-reported medical history and suggested scheduling her for additional testing (Pl. Mem. at 21; Pl. Reply at 2) is similarly unpersuasive.  It appears that Dr. Figueroa relied on Teresi's self-reported medical history in her opinion, but she also considered other independent information, including the results of a physical and mini-mental examination.  AR at 532, 534– 35.  Moreover, the fact that Dr. Figueroa suggested Teresi should have a psychological evaluation and an IQ test does not undermine the ALJ's reliance on Dr. Figueroa's opinion because those tests had already been performed and included in the record.  *Id.* at 391–94 (Dr. Barr's neuropsychology evaluation dated April 2015); *id.* at 392 ("Borderline impaired intellectual functioning" with and FS IQ of

75); *id.* at 492 (Dr. Kuzniecky reporting borderline impaired intellectual functioning); *id.* at 484 (Dr. Broska's psychiatric evaluation dated July 2015).   The record also contains evaluations of Teresi's impairments based on her IQ test results.  *Id.* at 102 (Dr. Hoffman referring to "prior IQ testing [that] revealed borderline intellectual functioning with FS IQ of 74" as additional evidence of MRFC determination).  Accordingly, the ALJ did not have an obligation to request these tests because the record already contained sufficient evidence on which to make a disability determination.  *See, e.g., Hyshaw v. Comm'r of Soc. Sec.*, 797 F. App'x 671, 672 (2d Cir. 2020) (no obligation to conduct formal intelligence examination where valid IQ testing previously performed); *Gillard v. Colvin*, No. 5:11-CV-1173 (GLS), 2013 WL 954909, at *2 (N.D.N.Y. Mar. 12, 2013) (no obligation to further develop record with additional tests "because the record was sufficiently robust for the ALJ to make a disability determination").

Finally, Teresi's argument that it was improper to rely on Dr. Figueroa's opinion because it did not render an RFC statement or address the extent of the Teresi's neurological impairments is without merit (Pl. Mem. at 21).  Here, the ALJ properly relied on Dr. Figueroa's opinion as to Teresi's limitations due to her seizure disorder.  AR at 25 ("Dr. Figueroa opined that the claimant should not drive nor operate motorized machinery, as well as avoid ladders and unprotected heights due to history of seizures.  The undersigned gives this opinion great weight.").  Dr. Figueroa's opinion, which is supported by other record evidence, establishes the extent of Teresi's seizure disorder.  *Id.* at 620 (Teresi reported on November 16,

2015 being seizure-free since her surgery); *id.* at 622 (Teresi's mother reported two seizures due to noncompliance with her medication on December 9, 2015); *id.* at 676 (Teresi reported being seizure-free on December 29, 2015 since last reported seizures); *id.* at 609 (EEG test results dated January 19, 2016 showed no indication of seizure); *id.* at 601 (Teresi reported being seizure-free since last visit); *id.* at 590 (same); *id* at 584 (same); *id.* at 570 (same).   The fact that Dr. Figueroa's opinion did not include a formal RFC statement does not undermine the ALJ's reliance on her opinion.   Moreover, it is not required that the opinion address every aspect of Teresi's functioning for the ALJ to accord it great weight.   *See, e.g., Daniels v. Berryhill*, 270 F. Supp. 3d 764, 775 (S.D.N.Y. 2017) (no error by according "great weight" to certain portions of medical opinion).

Accordingly, the ALJ did not err by assigning "great weight" to Dr. Figueroa's opinion.

### b.  Dr. Arlene Broska

Teresi argues that the ALJ erred by assigning partial weight to Dr. Broska's opinion because it was stale and her findings failed to properly assess Teresi's limitations.   The Court disagrees.

First, the fact that Dr. Broska's opinion was "rendered 2 years prior to the hearing" and before Teresi's brain surgery (Pl. Reply 4-5; Pl. Mem. at 21-22) does not necessarily diminish the weight the ALJ gave to it.   *Santiago v. Commisioner of Soc. Sec.*, No. 19-CV-2051 (KHP), 2020 WL 1922363, at *5 (S.D.N.Y. Apr. 21, 2020) ("[A] medical opinion is not necessarily stale simply based on its age. A more dated

opinion may constitute substantial evidence if it is consistent with the record as a whole."). Instead, "[a] medical opinion may be stale if it does not account for the claimant's deteriorating condition." *Figueroa v. Saul*, No. 18-CV-4534 (JLC), 2019 WL 4740619, at *25 (S.D.N.Y. Sept. 27, 2019). Here, the record suggests that Teresi's seizure disorder had, in fact, improved since her surgery (AR at 620 (Teresi reports on being seizure- free since her surgery); *id.* at 609 (EEG test results dated January 19, 2016 show no indication of seizure); *id.* at 601 (Teresi reported being seizure-free since last visit); *id.* at 590 (same); *id* at 584 (same); *id.* at 570 (same)), and that some of her other limitations remained the same (*id.* at 61–62 (Theresa testifying that Teresi has had no improvement in taking care of herself, cooking, performing math, or counting change). However, there is no evidence, and Teresi does not cite any, to suggest that Teresi's condition deteriorated after Dr. Broska's opinion such that it should be rendered stale.

Teresi argues that Dr. Broska's opinion deserves less weight because she incorrectly opined on Teresi's limitations. Pl. Mem. at 21-22. Specifically, Teresi identifies two instances where Dr. Broska improperly found no psychiatric limitations despite evidence to the contrary: (1) Dr. Broska found no evidence of psychiatric limitations in following and understanding simple directions and instructions but nonetheless documented that Teresi has difficulty with math and managing money, has ADHD, gets easily distracted and does not finish things; and (2) Dr. Broska found no evidence of psychiatric limitations in maintaining a regular schedule but she documented that Teresi continues to have seizures. Pl. Mem. at 21.

The ALJ, however, did, in fact, recognize some of the concerns identified by Teresi. Although the ALJ relied on Dr. Broska's opinion as to Teresi's ability to follow and understand simple directions and instructions and her ability to function on a daily basis, the ALJ assigned only "partial weight" to these opinions because the record as a whole established even greater limitations than what Dr. Broska had reported. AR at 25. With regard to Teresi's ability to follow and understand simple directions and instructions, the ALJ recognized Teresi's difficulty with math and managing money as well as some difficulties with concentration. *See id.* at 23 (RFC determination that Teresi can perform simple and repetitive tasks that do not require math or handling money); *id.* at 26 (ALJ giving some weight to Dr. Hoffman's opinion that Teresi has "moderate difficulties in maintaining concentration"). With regard to Teresi's ability to function on a daily basis, the ALJ also recognized the limitations imposed by Teresi's seizure condition. *Id.* at 25 (RFC determination that Teresi should avoid hazards). Otherwise, Dr. Broska's opinion is generally consistent with the record, and substantial evidence supports the ALJ's decision to assign it partial weight. *See, e.g., id.* at 372 (Dr. Salomon observed Teresi "[held] the attention to examiner throughout [the] entirety of [the] examination" and "[f]ollow[ed] multi-step instructions"); *id.* at 384 (Dr. Kuzniecky observed Teresi "answers questions and follow commands appropriately"); *id.* at 103 (Dr. Hoffman opined that "[Teresi] retains [her] ability to understand and follow directions [and] sustain attention/concentration for simple tasks . . . ." ).

47

Accordingly, the ALJ did not err by assigning "partial weight" to Dr. Broska's opinion.

### c. Dr. L. Hoffman

Teresi argues that Dr. Hoffman's opinion was entitled to less than "some weight" because she "did not have the benefit of reading or evaluating any evidence which accumulated since her opinion." Pl. Mem. at 22. As explained above, the fact that an opinion fails to consider subsequent evidence does not, on its own, render an opinion less reliable. *See, e.g., Santiago*, 2020 WL 1922363, at *5. The ALJ considered the evidence accumulated after Dr. Hoffman's opinion and gave it "some weight" because her opinion was "not significantly contradicted by any evidence since [the date of Dr. Hoffman's review]." AR at 26; Pl. Mem. at 22. Substantial evidence in the record supports Dr. Hoffman's opinion that Teresi had mild limitations in her activities of daily living and difficulties in maintaining social functioning. *See, e.g.*, AR at 58 (Theresa testifying that Teresi has learning disability that makes it difficult for her to understand certain instructions); *Id.* at 53 (Teresi testifying that she takes antidepressants to reduce anxiety and depression and help with social problems but also hangs out with friends, goes to movies and shows, and goes bowling); *Id.* at 384 (Dr. Kuzniecky finding Teresi answered questions and followed commands appropriately). The record also supports Dr. Hoffman's finding of moderate difficulties in maintaining concentration, persistence, or pace. *See, e.g., id.* at 58 (Theresa testifying that she needs to "keep on [Teresi] at all times"); *id.* at 372 (Dr. Salomon noting that Teresi

"holds the attention to examiner throughout [the] entirety of [the] examination"); *id.* at 534 (Dr. Figueroa diagnosing Teresi with history of attention deficit disorder). Accordingly, the ALJ did not err in assigning "some weight" to Dr. Hoffman's opinion.

### 3.  The ALJ Did Not Violate Her Duty to Develop the Record

Teresi argues that there are gaps in the medical evidence and accordingly the ALJ violated her duty to develop the record.  Specifically, she contends that the ALJ had an obligation to follow up with Dr. Salomon and Dr. Kuzniecky to "obtain a more definitive and updated assessment" of Teresi.  Pl. Reply at 7; Pl. Mem. at 22. Teresi also argues that the ALJ did not properly consider Dr. Salomon's treating notes.  Pl. Reply at 6.

#### a.  Dr. Salomon

The ALJ found that Dr. Salomon's April 19, 2017 opinion that Teresi is "unable to work" is reserved for the Commissioner and, on this ground, found Dr. Salomon's opinion is not entitled to "any special significant weight." AR at 25. Teresi argues that the ALJ had an obligation to obtain a "more definitive and updated assessment" about Dr. Salomon's opinion that Teresi was "unable to work." Pl. Reply at 7.  The Court disagrees.

It is well-established that "[t]he ALJ may not write off a treating physician's assessment of total disability as an 'ultimate determination' that is 'reserved to the Commissioner' while simultaneously abnegating her duty to develop the record." *Latour-Darch v. Colvin*, No. 14-CV-3000 (SLT), 2017 WL 2964812, at *8 (E.D.N.Y. July 10, 2017).  Instead, the ALJ must ensure that there are no gaps in the record

49

before rejecting a treating physician's opinion. *Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017) ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record, and then proceeding to 'carefully weigh' that record.")(citations omitted).

Here, the ALJ fulfilled her duty to develop the record as there are no clear gaps in the record.  Following the hearing, the ALJ sent a letter dated September 18, 2017 to Crystal Run Healthcare, where Dr. Salomon works, requesting "[a]ll records from September 2014 to present."  AR at 18, 537.  In response, the ALJ received treatment notes from Crystal Run Healthcare (including many of Dr. Salomon's treatment notes) dated September 23, 2014 up to July 20, 2017. *Id.* at 537-694. The record also contains treatment notes dated April 19, 2017, the same day as Dr. Salomon's opinion that Teresi is unable to work. *Id.* at 530–31, 568. Because there are no obvious temporal gaps in these records, and Teresi does not point to any, the ALJ is under no obligation to recontact Dr. Salomon for a more definitive and updated assessment. *See, e.g.*, *Hofsommer v. Berryhill*, 322 F. Supp. 3d 519, 529 (S.D.N.Y. 2018) ("[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim.") (citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999); *Monroe v. Berryhill*, No. 17-CV-3373 (ER) (HBP), 2018 WL 3912255, at *22 (S.D.N.Y. July 24, 2018) ("[A]n ALJ is only required to recontact [a treating source] 'if the records received were inadequate . . .  to determine whether [Plaintiff was]

50

disabled.'") (citations omitted), *adopted by* 2018 WL 3910824 (Aug. 15, 2018)).  To

the extent that Teresi argues the ALJ had a duty to recontact Dr. Salomon because

there were inconsistencies between Dr. Salomon's treating notes and her opinion,

this argument similarly lacks merit.  *See, e.g., Rebull v. Massanari*, 240 F. Supp. 2d

265, 272 (S.D.N.Y. 2002) ("A record that does not support a treating physician's

opinion does not necessarily contain deficiencies or gaps[.]").

Teresi also argues that the ALJ ignored and failed to discuss Dr. Salomon's

notes indicating that Teresi had multiple episodes of blacking out and staring.  Pl.

Reply at 6.[11]  The record does not support Teresi's argument.  The ALJ clearly

considered Dr. Salomon's notes as evidenced by the ALJ's citations to Dr. Salomon's

treatment notes describing multiple seizures (staring episodes) and summaries of

EEG and MRI results indicating seizures.  *See, e.g.,* AR at 24, 620.  The ALJ also

cited to Dr. Salomon's treatment notes describing that Teresi was "seizure free"

after surgery.  *Id.* at 24 (citing to *id.* at 584 (Dr. Salomon's notes from December 5,

2016 office visit)).  In discussing Teresi's seizure disorder, the ALJ also cited to

---

[11] Teresi also claims that the ALJ erred by not discussing Teresi's depression and
anxiety.  Pl. Reply at 6.  However, there is limited evidence in the record to suggest
that Teresi had a disabling condition of depression or anxiety.  Teresi cites a
diagnosis of depression and anxiety in treatment notes dated February 4, 2015 (Pl.
Reply at 6), but subsequent evidence indicates that Teresi had her depression and
anxiety relatively under control.  For example, subsequent treatment notes dated
February 8, 2016 demonstrate that Teresi was seeing a therapist and was stable
(*id.* at 607) and treatment notes from August 5, 2016 state that Teresi denied
"anxiety and depression" at that time (*id.* at 590).  Accordingly, the ALJ did not err
by failing to discuss Teresi's depression and anxiety.  *See, e.g., Schaal,* 134 F.3d at
505 (no violation of duty to develop record concerning claimant's mental disorder
where little indication in record suggested it was disabling).

underlying reports on Teresi's seizures that were provided to Dr. Salomon.  *Id.* at 24 (citing to *id.* at 296–99 (EEG results "indicative of a seizure tendency" that were communicated to Dr. Salomon)).  Although the ALJ did not explicitly refer to Dr. Salomon while discussing Teresi in this context, she considered and relied on several of Dr. Salomon's notes.  The ALJ is under no obligation to discuss or cite to every portion of a treating physician's notes.  *See, e.g., Brault,* 683 F.3d at 448 ("[A]n ALJ is not required to discuss every piece of evidence submitted" and fact that an ALJ does not "cite specific evidence does not indicate that such evidence was not considered").

Accordingly, the ALJ did not violate her duty to develop the record or err in considering Dr. Salomon's treating notes.

### b.  Dr. Kuzniecky

Teresi's argument that the ALJ erred by not re-contacting Dr. Kuzniecky, whom Teresi describes as her treating physician, is similarly without merit.  As an initial matter, the record does not support Teresi's characterization of Dr. Kuzniecky as a treating physician (Pl. Mem. at 22), where Teresi had at most two appointments with him in anticipation of her brain surgery.  *See, e.g., Cascio v. Astrue*, No. 10-CV-5666 (FB), 2012 WL 123275, at *3 (E.D.N.Y. Jan. 17, 2012) (finding ALJ decision that "two isolated visits, approximately one year apart, did not constitute an ongoing treatment' relationship rising to the level necessary for [physician] to qualify as a treating physician" was reasonable);  AR at 382–90 (Dr. Kuzniecky's notes from April 1, 2015 appointment); *id* at 493–95 (Dr. Kuzniecky's

September 2, 2015 report).  In any event, the ALJ had a complete record with respect to Dr. Kuzniecky's treatment notes and there was no need to recontact Dr. Kuzniecky about his opinion that Teresi was unable to work.

As the ALJ noted, and as Dr. Kuzniecky's report acknowledges, the only stated reason for this determination was Teresi's "upcoming brain surgery," which was scheduled for September 22, 2015.  AR at 25, 493–95.  No other rationale was offered for this opinion.  Thus, the ALJ appropriately concluded that Dr. Kuzniecky's opinion as to Teresi's ability to work because of her upcoming brain surgery has little probative value because it was "a temporary assessment."  AR at 25.  Although Dr. Kuzniecky anticipated reassessing this specific opinion after Teresi's recovery from the surgery, other evidence in the record, including Dr. Salomon's treatment notes, provided adequate information about Teresi's post-surgery recovery and seizure disorder to determine her ability to work.  *See, e.g.,* AR at 584, 620.  Accordingly, the ALJ had no obligation to recontact Dr. Kuzniecky, where the record was adequate to determine whether Teresi was disabled following her surgery.  *See, e.g., Quinn v. Colvin*, 199 F. Supp. 3d 692, 710–11 (W.D.N.Y. 2016) (no duty to recontact where record was complete and ALJ could consider medical evidence relied upon).

### 4.   The Court Has No Jurisdiction Over the Prior ALJ Decision

Teresi requests that the Court reopen her prior CDB and SSI application due to a "clear error of law" in the first ALJ's decision addressing that application.  Pl. Mem. at 23–24.[12]  As set forth below, the Court lacks jurisdiction to do so.

It is well-established that claimants must exhaust their administrative remedies by securing a final decision by the Commissioner before seeking review of an administrative decision in federal court.  *See* 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security made after a hearing to which he was a party, . . . may obtain a review of such decision by civil action . . . .").  However, with respect to petitions to reopen a prior application, federal courts lack jurisdiction to review decisions declining to reopen because they are not considered final decisions for purposes of 42 U.S.C. § 405(g).  *See Califano v. Sanders*, 430 U.S. 99, 107–09 (1977) (no subject matter jurisdiction over Commissioner's denial of request to reopen initial determination of benefits); *Byam v. Barnhart*, 336 F.3d 172, 180 (2d Cir. 2003) ("The Commissioner's decision not to reopen a prior determination is not a final decision for the purposes of 42 U.S.C. § 405(g), and thus is generally unreviewable even if there was a hearing in the case.").

Within the Second Circuit, there are two limited circumstances in which federal courts can review a decision not to reopen: "where the Commissioner has

---

[12] It appears Teresi has abandoned this argument as she does not address it in her reply papers.  For completeness, the Court will nonetheless address it.

54

constructively reopened the case and where the claimant has been denied due process." *Id*.  Neither exception applies here.

As an initial matter, this is the first time that Teresi has sought to reopen her prior application, and there is no evidence to suggest that she made any efforts to seek this relief prior to her appeal to the Court.  Moreover, there is no evidence that the Commissioner constructively reopened the case.  Instead, the ALJ's review was limited to evidence relevant to the onset date alleged in Teresi's current application.  AR at 27, 57 ("A. Okay.  But can I ask you a quick question? Like, why does it not go all the way to the beginning? Q. Because there was a prior decision in May of 2014, and her alleged onset date is therefore the day after that prior decision.  So if you want to give testimony, you can tell me what you've seen about your daughter since May of 2014.").

In addition, Teresi cannot challenge the Commissioner's denial to reopen her prior application on constitutional grounds because she never requested that her prior application be reopened in the first instance. Her generalized allegations that "it is unlikely that [she] was aware that she could appeal the ALJ's 2014 decision" (Pl. Mem. at 24) are insufficient to meet the threshold required to invoke federal court jurisdiction. *See Stieberger v. Apfel*, 134 F.3d 37, 41 (2d Cir. 1997) ("A claim of constitutionally defective notice, even in the context of a claim for disability benefits based on mental illness, cannot invoke federal court jurisdiction merely upon a generalized allegation, long after the fact, that the claimant was too confused to understand available administrative remedies.").  Accordingly, absent a

55

constructive reopening or a constitutional claim, the Court lacks jurisdiction over Teresi's claim that the Commissioner should reopen her prior application.

### III.   CONCLUSION

For the foregoing reasons, Teresi's motion for judgment on the pleadings is denied, and the Commissioner's cross-motion is granted.

The Clerk of Court is directed to close docket entries 17 and 21, marking docket entry 17 as denied and docket entry 21 as granted and to enter judgment in favor of the Commissioner.

Dated: August 31, 2020
      New York, New York

_____
JAMES L. COTT
United States Magistrate Judge

56